May it please the court, Charles Sevilla on behalf of the appellant, Mr. Baiocchi, and I'd like to reserve three minutes. I'd like to first address in this argument the issue of venue, which I believe is a nice, tidy issue uncomplicated by a number of the factual arguments that are the mail fraud scheme argument. In this case, the phone calls at issue, there are two counts involving phone calls on April 22nd and April 24th, 1997. There's no question that my client did not make those calls. There's also no question that those calls were not originated in, passed through, or the next question is whether there was proof by the government to sustain its burden of preponderance that Mr. Baiocchi caused those phone calls, which went to the two named victims, Ms. Green and Mr. Bailu. The evidence of that has to stem from some conduct that appellant had to have done to cause those phone calls. It's pretty clear that Ms. Green said that the phone call that she received for completion monies came from Mr. McClintock, who was at that time running the oil company. Mr. Bailu, depending on who asked him the question, said the call either came from Canada, a salesperson in Canada, or it came from McClintock. Now, where did your client run his business from? My client ran his business from the Central District, but the venue question assumes, we can assume for the sake of argument, the existence of a scheme that extended to the Central District, but that does not establish venue. Venue is very particular in a wire fraud case to the point of origin, the pass-through, the reception, or somebody who caused that. Now, in this case, the government is arguing that conduct that occurred in 1996 with respect to the initial raise of money that put these people in the South Prairie well, because this well had a two-part investment. They would invest originally in 1996, and then the question was, if the well was determined to be commercially productive, they would be asked to make a completion. Now, the problem was, my client did not participate in the completion of South Prairie, because he had left his job with this oil company, stating that he would no longer do completions, and he didn't do the South Prairie completion, nor did he do the completion that despite the fact that he was asked to do the two completions, which were in fact his job in 1996, he refused to do it because he felt that the oil men were not living up to their representations of what they would do for these investors, and that particularly was putting gas wells in association with the oil well, so there'd be some guaranteed income. So, by 1996, December, there was a completion that he refused to do. That's the one at three. In April, that's the completion on South Prairie. He refused to do that one as well. Mr. McClintock sent out the mailings for the completion to both Ms. Green and Ms. Bailu. Those were mailings in March 7 and 10, 1997. So, Mr. McClintock, with respect to Ms. Green, followed up, because he didn't get any money, he followed up with a phone call in, I believe it was April 22nd for her, 1997. There's no evidence that my client caused him to make that phone call, and whomever called Mr. Bailu on April 24th, there's no evidence my client caused that person to make a phone call. Without evidence of causation, there is no evidence of venue in the Central District, and the case we cite that is apropos to this, which I think is stronger for Mr. Bailu than it was for Mr. Pace, is the Pace case. In Pace, Mr. Pace was prosecuted in Arizona. He had sent money from Mexico to his office in Ohio. There were two wires that were at issue there in two counts, and that money went from Mexico to Ohio. Those are the two wires in the two counts. So, the question was, well, what did Mr. Pace do in Arizona that gave Arizona jurisdiction? And this court said there's no proof that he did anything from in Arizona, because he had offices in Ohio, he had offices in California. Here in Pasadena. Well, he had offices, Pace had offices in Arizona. That didn't... But he also had offices in other locations. Right. He himself had an office in Pasadena. Did your client have an office anyplace other than Newport Beach? There's no evidence of that, but there's also no evidence where he was in April, well, I can take all of 1997. There's no evidence that he was in any particular place to tell these people to make phone calls, because the only way the causation could extend to venue in the Central District is that Mr. Baiocchi did something in the Central District somewhere close in time to get these people's, get these completion phone calls made. And of course, we have a whole argument that he was out of the business by the end of 1996. And that's a separate argument that the people did not prove beyond a reasonable doubt that he was even still in business because of the hostilities between them and his refusal to participate in the completion. Let me try this on you. Cause is a complicated proposition in many areas, and I think slightly complicated in this area too. At one level, it's child's play to show that he caused these calls to be made by your very own narrative. He refuses to make them, and therefore somebody else makes them. That sounds like cause to me. But then your argument is going to be, but the fact that he refused to make them is evidence on his side that he's not involved in criminal activity. But the criminal activity charged here is conspiracy. Mail fraud. Excuse me, is mail fraud. And he's arguing that he withdrew from the organization that was doing this, but that's been rejected on the merits. So the argument that's a venue argument may then collapse into the substantive argument as to whether he's guilty. Well, in Pace, the assumption was Mr. Pace, for the venue argument, the assumption is he's guilty. That he instructed his secretary to send those wires from Mexico to Ohio. So the venue issue has nothing to do with guilt or innocence. It's where's the demonstration of locus in the central district in this case, or in Arizona. Despite the fact that Mr. Pace had an office in Arizona, had a secretary doing business in Arizona, there was no instruction. And what are the specific acts of mail fraud that are charged in this case? The specific acts are on April 22nd, 1997, a phone call was made to Frieda Green in, I believe she was in Pennsylvania. And the gist of her testimony was the phone call came from Mr. McClintock. He was never in California. So it's these two phone calls that we're talking about. Correct. Well, and if on the merits, the jury is able to hold, quite aside from the venue question at the moment, that he was sufficiently involved in the scheme that he can be held criminally responsible for these phone calls and mail fraud. I think it's child's play to say that he caused them because the fact that he wouldn't make them caused them to be made by these other people. Well, I would say there still has to be demonstrable evidence that he did something from the central district in April, January, February, March, April, to cause them. Because if involvement, the scheme is not demonstrable alone of venue. There has to be conduct that demonstrates conduct in the central district. So let me address then. Could I ask you, the remedy here, if I understand it, if you're correct about the venue problem is your client gets a dismissal without prejudice, and the government can then refile it at the proper venue. Is that your understanding too? That's correct. So that the government wants to charge your man in Oklahoma or Pennsylvania, they can go ahead and do that? They would have, yes, they would have the choices of the place where the phone calls were received, which would be Illinois, Pennsylvania, or where they were generated. And that would have been, in our judgment, Mr. McClintock made both of the calls. He had offices in Oklahoma and Arizona. And the government alleged its position is that a fellow from Canada, a salesman made. So just following up on Judge Silverman's question, if you prevail on this one, what you're going to get is a trial not in the defendant's home district, where he lives, where he works, and so on, but rather, more likely, in the district of his victim, far from his own home. We'll take that, Your Honor. I bet you will. It's the trial you've already had, I guess. Yes, definitely. But if we're looking at what venue is designed to protect, it's not designed to protect him getting a trial in the hometown of his victim. Well, it depends whose ox is being gored here, but the issue is, did the people prove that in April 1997, my client caused those phone calls? And I think if Pace is looked at closely, you'll see that Mr. Pace's conduct was, temporally, right on top of the wire frauds. So you like Pace with regard to the temporal. And Pace does contain the other factors. Pace specifically says, the evidence suggests the fax was sent from Pasadena, California, emphasizing that he had two offices, and the one that he did this from wasn't Arizona. Your client has one known location, and the jury could reasonably conclude that whatever he did was done from there. You're trying to emphasize separation in time, but I don't know, for geography, whether Pace helps you that much. Well, given the context of this case, where it's undisputed that my client ceased doing business with Petro in the end of 1996, to say that in April, he must have caused something from the Central District is pure speculation. Well, but isn't, that he must have caused something, isn't that the core of the jury's verdict? Well, there's no, my position is, this is just about geography, and we don't really have any reason to think it's other than the Central District for your client. Well, it's, that's a matter of speculation as to where he would have been sometime in the first part, the first quarter of 1997. Let me address the withdrawal issue then that did the, our issue concerning whether the people, the prosecution proved beyond a reasonable doubt, I realize the standard is not beyond a reasonable doubt here, it's Jackson versus Virginia standard, could a reasonable jury find that he didn't withdraw? One of the issues we raised in the instructions is that they were not given that instruction, that they had to find beyond a reasonable doubt that he had not withdrawn. That's the instructional issue. On the facts, it's supporting both the giving of that instruction and reversal under the Jackson v. Virginia claim. There's no, one of the things about telemarketing is you don't work for nothing. And my client, after he refused to participate in the completions on the last two wells, he made it clear he wasn't going to do that. As a matter of fact, he told Mr. McClintock's secretary, I'm not doing either one at, that's the fifth well or Southbury, the sixth well. There's no evidence that he did do work on either of those wells in 1996. With respect to the, there were hostilities between, very hostile conversations between McClintock and my client, they're recorded and discussed in the briefs. One of the things about the sufficiency on the withdrawal issue is my client, the evidence is he's out by the end of 96. Now, in order for there to be a call for completion funds on the Southbury well, which is the only well that's really at issue here, there had to be some conditions preceding, like the well engineer had to say this is a commercially productive well. On the other wells, he did that. On the sixth well, he did not. And he told Mr. McClintock on February 26th or 7th, 1997, this isn't going to be a commercially productive well. Nevertheless, McClintock went ahead with, of course, without my client doing any of the completion calls. Thus, Mr. McClintock got to pocket all the money. He did drill the well, and it was a dud. Now, how could my client contemplate when he left at the end of 1996, that McClintock would go forth, lie to these investors and say, we've got a commercially productive well here in South Prairie, and go forward with it. There was no requirement for these investors to pay completion calls in any event. But there was, per the contract that my client had with the oil company, they weren't supposed to go forward on wells that were not deemed commercially productive by the well engineer. That's cited in Mr. Ross's testimony on page seven of the opening brief. So my client's out at, say, December 1996. He's refusing to do what he was contracted to do in the first four wells, and no longer does it, no longer is really talking to these people. And then some conditions precede and come along. The well is now drilled, South Prairie. Is it worthy of commercial production? The well engineer says, no, it's not. Yet, McClintock goes ahead and tells everybody, oh, it's going to be a great one. Let's have your completion money. So I would say that there is no factual connection between my client and those phone calls, because he was out of it, and it was not in his control. He made it clear to Mr. McClintock, as the cases require, for withdrawal. Did he make it clear he was no longer participating? I cited, well, Lothian says that. That's a Ninth Circuit case. Nerdlinger says that. And Goldberg says that. Those are two out-of-circuit cases we cited. If you make it clear to the co-conspirators or schemers that you're out, that is withdrawal. Well, there's a second half, and that is the foreseeable result. Right. And the analogy there is to the ticking time bomb. If in December, my client helped light a fuse that was going to go off, and he says, well, now I'm out. And of course, it's foreseeable that bomb is going to go off. And so despite the fact that he may withdraw, and the bomb went off, that's a foreseeable event. In this case, the foreseeability is interrupted by a number of independent intervening factors for which my client could not foresee. How could he foresee, number one, that when the well was drilled in 1997, that it was going to be, in the determination of the well engineer, not worth pursuing? And how was he going to determine then that Mr. McClintock would say, despite the fact that it's not worth drilling, I'm going to ask for the completion of the money from the investors so that he could pocket the money, which he did. And so I think that's the lack of the foreseeability in this case, is because... Well, didn't he make representations that got them into the scheme to begin with? And isn't it then also logical that having invaded these people into investing their money on false pretenses, that a follow-up call would be made? Well, the government argues that his salespeople misrepresented the initial investment by not revealing commissions. I say that is a matter of law, in this case, not fraud. The fact that his company had to pay 50% of the investment in overhead and salaries and commissions, and my client made 3% on the raise. That is not extraordinary. That is not fraud. All of this... How about misrepresenting the tax implications and the existence of gas wells? With respect to the existence of the tax write-off, the only person who said that he would not have suggested that is Mr. Ross, who was an oil well man and not a tax person. There were, as our briefs indicate, there were tax-familiar financial experts who came in and said 76% write-offs are the rule. Now, the question is whether it's intangible or tangible, but there is no evidence in the record to refute the fact that they were entitled to the write-offs. And we cite in our reply brief, and maybe even in the opening brief, a number of investors who came in and said, I took the write-off and I got it. Another one said, I took the write-off, I got audited by the IRS and I got it. So I'll look forward to hearing from a respondent where there is testimony indicating that the 76% write-off was inappropriate, but the record doesn't support that. And in fact, it shows that the investors who took it got it. The last question was on the gas wells. The deal between my client, who was raising the money for the oil well people, was that the oil well people were required to get gas wells. It's in the prospectus, it's called the PPM in the brief, that there would be the purchase of existing gas wells. In the first couple of pages of the opening brief, when we recite what Mr. Ross, the oil man, told the investors, he told them, I am now into fields which have wonderful gas wells and we're going to get them. Now, my client had no control over getting gas wells. His obligation was to get the money and the wells would be dug and the gas wells would be purchased. That's what Ross promised. He reluctantly said, yes, I did say I would get the gas wells. It was a bad time in my life and I lied. And I took some money. And I took a lot of money. Why don't we hear from the government? You've run up against your time limit, but we'll allow you to have some time in response. May it please the court. Rob Adkins on behalf of the United States. Your Honor, I want to respond first to the last item that was brought up by counsel. I know that sufficiency of the evidence is in an argument that was brought up in the brief, but I do need to respond because it's the same argument that was raised at the trial and it's factually incorrect. The three main misrepresentations as alleged in the indictment and as conclusively proved beyond any reasonable doubt at trial were the following. First, not just that there were 60% commissions that were coming in off the initial investment and going to the defendant and that that was not disclosed, but specifically that it was concealed by the defendant personally on a phone call where he was taped saying, when you go through me, this is a tape with a potential investor, when you go through me and use me and you're my client, you won't pay a penny more. It's completely untrue. That takes it completely outside the box that counsel has painted as falling within lines where it's factually and legally improper. That is completely proper. And as the witnesses testified time and again at trial, if they had known about that commission and it had not been misrepresented to them, they would not have invested. One of the reasons for that brings us to the second allegation, which is the tax write-off. That also has been misrepresented. It isn't that you are, the misrepresentation is not that you're able to take a tax write-off of 75% of intangible drilling costs. Everyone agrees that that's true at the trial. Counsel's right. That was established. There were no, he's incorrect. There were no experts called at trial by either side, nor were they necessary. The point is simple math. Intangible drilling costs, as we're shown through an AFE, which shows the expenses related to the intangible drilling costs, occur at the well. Things that go into the drilling of the well. 60% of the money invested never went to the well. So the 75% would only be of that remainder. And that is an important factor in understanding why that was a misrepresentation to the taxpayers. The third misrepresentation was not, again, to be clear, it was not that gas wells would later be acquired and that they would try and find them as Mr. Ross had promised. Factually, I agree with defense counsel. Mr. Ross, and as they tried a trial to make the trial about Mr. Ross and Mr. McClintock rather than the defendant, it is true that Mr. Ross made representations that he was going to try and find wells. It's also true that he communicated, according to his testimony, to Mr. Baiocchi he was having trouble finding them. Regardless, at the time the defendant was making representations himself personally and his telemarketers at ITS, he was representing to the investors that they already had the gas wells, that the gas wells were already producing. And importantly, because there were gas wells that were already existing and producing that the investors were paying into, this was no longer a risky investment. Oil and gas is very speculative and very risky. And there was a lot of pushback by investors on that issue. It was the existence of the wells prior to investment, prior to the drilling of any wells, and prior to Mr. Ross making any efforts to obtain wells. That's the misrepresentation that was so important to the investors. Because it provided the defendant's words, again, on tape, it made it safe for them to invest. And so those are the allegations. I do, I apologize for going on so long about that. I do want to talk about the withdrawal and venue issues because I do believe that they are somewhat related. I want to make clear our position with respect to withdrawal. And I do want to get to the Court's point on the foreseeability because I do believe that the facts in this case are squarely within the four corners of United States v. Lothian. But to be clear, the government, the jury was instructed on withdrawal. And they did find the defendant guilty. The government's position, number one, is that there was not, in fact, withdrawal in this case. Defense counsel states, in fact, that the defendant was completely out of the business. In 1996, much of what he relies upon for that fact is that they called Mr. McClintock, who they otherwise disparage as not credible and that the courts also found to testify to a lot of those facts. But the evidence at trial was that it's important to understand these investors, the business that he was out of, was not Petro Resources. The business that the defendant was engaging in at ITS was with what he called his clients, which were the people that he would mail these various letters that we reference in our brief to the investors where he said, to our clients, we have a number of different programs that we're going to recommend to you. And we, the defendant's company, have a fiduciary responsibility to you and we will keep you fully informed as to these projects. The Petro Resources isn't the business. ITS is the business. And he never withdrew from ITS, which was located in Orange County. And he had loaded those investors into those programs. And there's evidence, and I don't want to just go over what's in my brief, but very, very briefly, there is evidence of a continuing involvement by the defendant that does not indicate withdrawal, such as the conversations with victim investors, like Mr. Tarlin, who testified about, in 1997, trying to get ahold of the defendant and then eventually getting ahold of the defendant. There's no statement to Mr. Tarlin, the defendant's client, to whom he owes a fiduciary responsibility about any fraud or withdrawal from the scheme. It's merely, eventually he tells him, we're going to try and find these gas wells to which Mr. Tarlin shows surprise because he thought they already existed and that's why it was safe. And then later tells him, when Mr. Tarlin thinks there's fraud, and this is in 1997, it's the middle and his latest September of 97, don't go to the SEC. And it's important to note that what counsel's referring to as Mr. Biocchi being in a heated discussion, there is testimony along those lines in the record about a heated relationship between Mr. McClintock and Mr. Biocchi, the defendant. It's clear, I think, from the record, including an audio tape that was played at trial between the defendant and Mr. McClintock, that that heated relationship had everything to do with an SEC inquiry that had happened. Can I ask you about the venue point? What's your argument as to why those calls, both to Mr. Bio and to Ms. Green, were caused by the defendant while the defendant was acting in this district? Your Honor, the government's argument does rely upon the Pace decision. I think that Pace accurately sets forth the standard and with respect to orchestration and, as it says in that opinion, to a causal connection. The government's argument is that the calls were placed to these two individuals. We'll talk about the two investors and their testimony in one minute. But the government's argument is that there was a causal connection firmly established between the defendant's operation and the Canadian operation that was placing calls to various investors. And were also being placed by the defendant's office within Orange County. The evidence at trial, of course, as the Court has noted, was that the jury was instructed, as the defendant had been charged, with causing acts to be done, that's what the two counts were, from the central district. And they found him guilty. The facts in support of the venue issue is a preponderance of evidence standard. The facts in support of that, as laid out in our brief, are all the facts establishing the connection between the defendant and his co-schemer. Mr. Tweezer, he also goes by Mr. Walker. Many of the facts that are cited in defense counsel's brief come from when they called Mr. Walker, during their case, an alleged co-schemer. And even he admitted on the stand that he relied entirely on Mr. Baiocchi, because he was 21 years old and just had a history of employment with hamburgers and things like that, that it was wholly run out of the office, entirely in Orange County. The brochures that went out, the calls, the pitches were identical to these victim investors, including to the two named investors in the indictment, Ms. Green and Mr. Below. And I want to be very frank with the court with respect to Ms. Green and Mr. Below. Mr. Below, counsel, I think, misstates the record. Mr. Below's testimony on direct was that he believed, he received a call from a Mr. Buffett, who was the assistant to Mr. Walker at the Canadian company. And that's who he believed made the call to him for completion, the one that was charged. And he had very specific recollection. Now, in cross-examination, there were several questions about Sam McClintock. Those were in leading questions. That was not from Mr. Green, or excuse me, from Mr. Below, but those leading questions like, is it possible, could something like that have happened? To which he said, it's possible. He said his best recollection was that it came from Mr. Buffett. And that's corroborated, Your Honor, with a February 12th, 1997 letter, in which I think it's Exhibit 58 at the Government Secretary's of the Record at 340, which is a letter from Mr. Walker, and introducing, and again, this is in 1997, introducing his assistant, Mr. Buffett. And please call him if you have any questions. He's going to be handling these issues. So there is a causal link, and that is, and the government believes it's dependent upon cost-cumulative liability. Mrs. Green is a closer call. Her testimony is closer. Her testimony, she was an 82-year-old, not native English-speaking woman from Austria. And her testimony, she initially said that she believes she got a call from Canada. She later said that she thought it might have been from Oklahoma, and she couldn't remember the names of all the states. Her testimony was a closer matter for the court, but she received the same misrepresentations as the others, and we did have her check, which identified, and she said that she would have received a call before sending in that check. And so the government's argument to answer your court's question is premised upon cost-cumulative liability and causing an act to be done based upon all the evidence that was in the record before the jury in finding their verdict. If I could, I did want to address a couple of the other issues that were brought up in the brief if the court would like, but maybe I should first finish back around to the foreseeability argument. Well, I do have a question, although I'm not sure how relevant it is. The defendant would like us to think that it's very relevant. There are several candidates for being bad guys in this story. Two of them are McClintock and Ross, and the entire defense, really the core of it was, listen, there are other bad guys, I'm not one of them. Yes, you are. So what happened to McClintock and Ross? Were they prosecuted? Are they going to be prosecuted? Are they sitting somewhere with lots of money in their pocket, drinking gin? What's happening? It's a very good question, Your Honor. Unfortunately, I'm not in a... I could go outside the record to explain to you some of what occurred with that, and maybe I can just put it this way. I was not the prosecutor who indicted the case and made those decisions. I do know this. Certainly, Mr. Ross and Mr. McClintock are wrongdoers. The government never said anything different. The government only called Mr. Ross to the stand. He had, prior to my involvement, a proffer agreement. No, there was no immunity given or anything like that, but he did come in very early and talk to the government. There's also history involved as to the difference between this defendant and his having done this kind of thing in the past with respect to telemarketing. It's not in the record, and I do believe it should be irrelevant to these proceedings, but there is a factual background to that decision. Are they going to be prosecuted? I think that's extremely unlikely, and I do believe the statute is passed with respect to those two individuals. I will say that Mr. McClintock, at the time that decision would have been made, I believe he was in jail at the time that any indictment would have been brought. At least that's my recollection, but it does precede my time in the case. Okay, but a short answer is, with respect to the events at issue here, this defendant was the only one prosecuted criminally. That is correct, Your Honor. In a scheme, importantly, with co-schemers, we did not prosecute Mr. Walker-Tweezer up in Canada, but your question does bring up an issue that I did want to at least tell the court, which is with respect to the, there was an allegation of prosecutorial misconduct in the rebuttal argument. I just wanted to assure the court, I take very seriously my responsibilities. I was the trial attorney. And as I admitted in my brief, I did use the word nose in respect to fencing. That was not an intentional, I was not trying to imply something by that. The point of that commentary during the rebuttal argument was, the entire defense argument had been focused on Ross and McClintock, and all the evidence against them, but had ignored critical evidence against the defendant. The import of my comment and rebuttal was just the reason defense counsel didn't mention the tape of his own client, which was in evidence and undisputed, was because it proves his client's guilt. The nose was inadvertent, and I just wanted to make that clear with the court that I certainly did not intend anything by that. Finally, I did want to loop back around to the foreseeability prong, because I think it is important in understanding the government's position with respect to withdrawal. The government, like I said, the government believes that there is an argument, a very strong argument, that the defendant did not indeed withdraw, because as he said on the tape, his real intent was to try to evade the SEC inquiry. And as he said on a tape with Mr. McClintock in late 1996, his motivation was to keep his name out of it, to have McClintock not refund any money to the South Prairie investors, to have McClintock finish it. Mr. Biocchi would get the completion, Mr. Biocchi would quote, schmooze the investors, and then he'd transfer the money and not refund it. And there was discussion of the SEC inquiry during that call, and there was importantly, I think, the statement by the defendant that he would then, if McClintock did not go along with it, he would throw him to the dogs, and that he had more on Mr. McClintock than he ever knew. And that that was the true motivation, the SEC portion, not that the defendant suddenly withdrew from the scheme, but that in fact, he was trying to keep his name out of it. And there was plenty of other evidence in the trial that a jury could certainly have inferred that same motivation, including a false letterhead that had been created by the defendant's company with forged signatures and a signature stamp of Mr. McClintock that was not legitimate. The defendant telling his telemarketers not to tell the investors that he was the president of ITS. And his statement to Mr. McClintock on this audio tape, you want to put my name on it now? In sort of reference to you, Mr. McClintock asking Mr. Biocchi to get involved with the issues with some of these investors. Let me ask you about this January 3rd letter sent to Mr. McClintock from Thomas Pistone. That letter was not admitted into evidence on grounds that it was self-serving hearsay. Yes, Your Honor. I'm not sure that's the correct ruling as to hearsay. There's a lot of stuff in it that may be seen as hearsay, but the purpose for which it was sought to be introduced was what the letter purported to do, which is to say purported to withdraw. Isn't that correct? I believe... And if the letter is being introduced for what it purports to accomplish rather than for the truth of the statements therein about, well, I did this and you did that, why was the judge correct in keeping it out on grounds of inadmissible hearsay? Well, Your Honor, I believe there was some discussion about self-serving hearsay. That's, as we note in our brief, not an appropriate basis to use something out, but as to hearsay, there were actually three different reasons the judge articulated in keeping it out. One was hearsay. One was a lack of foundation for the witness who was actually going to be testifying about it who said he had no knowledge about the contents of the letter whatsoever. Well, he didn't quite say that. He says, I don't really remember. That's correct, Your Honor. There were two portions where Mr. Pistone testified in a proper outside presence of the jury and at trial, and he said that he did not really recall what was said. He did believe that if it was in there, it would have been provided to him by the defendant, but he didn't remember if Mr. McClintock had had any response or not. He did testify about the fact of the letter. I do believe that the contents of the letter are hearsay, not self-serving hearsay, but the- Well, some of them clearly are. And the argument forwarded, and I think this is noteworthy, the argument forwarded in the reply brief and in the opening brief on appeal as to why this is not hearsay is that it shows the defendant's state of mind. And I think that it's quite clear- I'm not sure I agree with that. I've got a slightly different argument, which is it's trying to do something. Now, you can argue in various ways that it's not very convincing that this is in fact what they're trying to do. I'm not sure how powerful a piece of evidence it is, but I'm not sure it was properly excluded as hearsay when the argument is, I'm trying to show that I withdrew. I understand, Your Honor. What was the- what was- Mr. Atkins, what was the argument made by the defendant at the time of the trial? I know now in the brief they're arguing it's a present sense impression and something else, but what did they argue to the judge when the hearsay objection was made? I don't recall the argument. It certainly was not the one that Your Honor just posed. I think that is correct. The argument I'm making is- I apologize that I don't recall specifically if there was an argument that was forwarded. They disagreed with the hearsay, but I don't remember them saying anything along the lines of not for the truth or things of that nature. I do believe that certainly what's raised here with respect to the present sense impression, the Ponticelli case answers that question, I think, with the ability for reflection. And the only reason I raise that is that also with respect to Your Honor's question, should it have been admitted for that other purpose, a non-hearsay, not for the truth purpose, but merely to show that there was some communique of withdrawal. The judge also very specifically said that under 403 he was excluding it. He felt that it was also untrustworthy. I don't know if he specifically said this, but I think a proper basis to affirm also is, again, the historical context before this letter in January is that the SEC was already involved. And this is a letter that was produced long after he'd been aware of that, claiming that he had suddenly become aware of some problems that might have been occurring. And there was no evidence by the witness who was being offered through that that witness knew the truth of any of those matters. Now, okay. Well, I'm not sure we need to belabor it very long. And it may be something quickly in rebuttal. My own view is even if it was kept out erroneously, and given the arguments that were advanced, I'm not sure I can hold it against the district judge for not admitting it, even if I think it should have been admitted. But I'm tempted to conclude that even if it was errored to keep it out, it was harmless given the other evidence in the case. And we've, yes, Your Honor, I won't belabor the point. There were, we've listed in our brief, in summary, the other areas that this was extensively explored, including questions related to it. Okay, you're at the end if you want to wrap up. Your Honor, I would just, I would submit at that time, I'd also like to just reiterate the, these issues that have been raised, and many of the other ones I wasn't able to address, including the statements in rebuttal and otherwise, were unobjected to, and just to reference the appropriate standard of review. Okay. Thank you, Your Honor. Thank you. Would you like a minute? Yes, Your Honor, I'll try to talk fast.  Thank you for the minute. With respect to the Pistone letter, it was proffered. First, they had a hearing outside the presence of the jury, and he testified as he did. The letter was before the court. There was a motion for new trial brought as to why, more specifically, it should have been admitted. But clearly, the argument was, he was withdrawing. It was relevant to show Mr. Baiocchi's position in December and early January. And with respect on trustworthiness, every statement, or most of the statements that he made about his concerns at the time, that is, I want an independent geologist to confirm wells are drilled and commercially viable. That proved up because Mr. McClintock went ahead and drilled a well that was determined not to be commercially viable to see if it would justify a call for completion calls, completion funds. He asked for an accounting to show that investor money was obtained and not diverted. The deal that the oil company had with the investors was that they could not take any cash, no money. All the money was to go into the project. And the oil company got 25% of the investment. That is, they would reap 25% of the royalties and own 25% of the wells, and the investors had the other 75%. That's the way it worked out, except Mr. Ross and Mr. McClintock looted the place of hundreds of thousands of dollars that should have gone for gas wells. So that was a statement in Mr. Postone's letter that was proved out to be true. And then he said, stop demanding more money from investors until conditions meeting completion are verified. And that came after he, this came right after he said he was not going to participate in the one at three well and preceded South Prairie. Again, that proved out because Mr. McClintock went ahead and sought money when he shouldn't have. So in terms of, it's clearly relevant to show Mr. Baiocchi was pulling out of any scheme to be involved in business with these folks. Okay, that last two minutes, but if you have some other thought you want to wrap up with. With respect to the comment on the comment and final argument, it's not the character of the prosecutor that we're talking about. It's the character of the comment and for a jury to hear from a prosecutor that the defendant knows the evidence, the defense attorney knows the evidence proves he's guilty is objectionable, wrong. I think counsel concedes that's erroneous and I would say harmful. And I'd ask for reversal for the grounds stated. Okay, thank you. Thank both of you for your arguments. The case of United States v. Baiocchi is now submitted for decision. Oliphant v. Mendoza Powers has been submitted on the briefs. We have one last case on the calendar for which one counsel was delayed, but I gather is now in the courtroom.
judges: Silverman, W. Fletcher, Clifton